IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAH STROBEL, by and through her parents and natural guardians, TRACY STROBEL and BRIAN STROBEL, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 15-1089 |
| v. | ) ) | Judge Cathy Bissoon |
| NESHANNOCK TOWNSHIP SCHOOL DISTRICT, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Pending before the Court is a Motion for Summary Judgment (hereinafter "SJM," Doc. 147) filed by Defendants Neshannock Township School District (the "District"), and Tracy McCalla, Luca Passarelli, Lesley Herman, Jeanne Pursel, Lina Busin, and Anita Slater (the "Individual Neshannock Defendants" or the six "chaperones") (all collectively, the "Neshannock Defendants").[1] For the reasons below, the Neshannock Defendants' SJM will be granted in part as to all claims arising under federal law. The remaining state law claims will be dismissed without prejudice, and the Court will dismiss the remainder of this action, as the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

---

[1] The Amended Complaint (Doc. 141) misspells several of the Individual Neshannock Defendants' names. The Court will use the spellings stated in the Neshannock Defendants' filings.

**BACKGROUND**[2]

This lawsuit arises from an appalling event. A group of students sexually assaulted Plaintiff Sarah Strobel ("Plaintiff"), while she slept, on a return bus ride from a Neshannock High School field trip. (See generally Plaintiff's Responsive Concise Statement of Material Facts, hereinafter "Plaintiff's Facts," Doc. 159.) The lawsuit also stems from the Neshannock Defendants' response to this event, which Plaintiff argues enabled her subsequent harassment by one of the students involved in the assault. (Id. at ¶¶ 118-24; Plaintiff's Brief Opposing Neshannock Defendants' Motion for Summary Judgment 13-15, hereinafter "Plaintiff's Brief," Doc. 158.) The relevant series of events follows.

### I. The Assault

Approximately 48 high school freshmen and the six chaperones, who served as teachers and administrators at the District, attended a class field trip to New York City from April 25 to April 27, 2013. (Plaintiff's Facts ¶¶ 1-3.) Prior to the trip, Defendant Tracy McCalla ("McCalla"), the District Junior High School Principal and a chaperone, discussed matters of security and school rules with the other chaperones and the students. (Id. at ¶¶ 4-5.) The trip had been anticipated for over a year. (Id. at ¶ 114.)

On the ride home from New York, the chaperones sat together at the front of the bus, and occasionally walked up and down the aisle. (Id. at ¶¶ 14, 34.) Plaintiff fell asleep on the bus after dinner while listening to music; her seatmate fell asleep as well.[3] (Id. at ¶¶ 16-17.) Near

---

[2] For purposes of resolving the Neshannock Defendants' Motion, Plaintiff's evidence is credited and viewed in a light most favorable to Plaintiff as the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Plaintiff's evidence and the evidence that Plaintiff does not dispute, construed favorably toward Plaintiff, show the following.

[3] There was a trip rule requiring students to sit next to students of the same gender, but the chaperones neglected to enforce this rule and were aware that opposite-gender students were sitting together; there were no gender-based restrictions on whether students could sit behind, in

the end of the drive, sometime between 12:15 a.m. and 12:45 a.m., Plaintiff awoke with a blanket over her head and Defendants Tiara Saado ("Saado") and George Root ("Root") touching her vaginal region over her pants and her buttocks under her pants. (Id. at ¶ 18; Plaintiff's Brief 2.) Two other students, Defendants Anthony Staph ("Staph") and David Ross ("Ross"), also participated in the assault. (Plaintiff's Facts ¶¶ 32, 38, 43.) Prior to the assault, Plaintiff had not had any problems with these students, and these students had not been disciplined for any prior incident involving improper touching or sexual misconduct. (Id. at ¶¶ 51-55.)

The chaperones and the District were not aware of the assault until several hours later on April 27, 2013, when Plaintiff's mother reported the incident to the District. (Id. at ¶¶ 23-28.) That same day, McCalla spoke with the other chaperones, who advised McCalla that they were not aware of the incident. (Id. at ¶ 30.) Two days later, on Monday morning, the District and the Neshannock Township Police Department began their respective investigations. (Id. at ¶ 31.) Based on the District's investigation and informal hearings, Saado, Staph, and Root were suspended, and the District later entered into agreements in lieu of expulsion with those students and their parents that prohibited the students from having any direct or indirect contact with Plaintiff until the commencement of the next school year. (Id. at ¶¶ 39-42.) Ross was not disciplined, despite evidence of his involvement, and was in class with Plaintiff upon her return to school. (Id. at ¶¶ 43-45, 49; Plaintiff's Brief 3.) However, Ross and Root did not return to the District for their sophomore year. (Plaintiff's Facts ¶¶ 63-64.) After returning to school for one

---

front of, or across from each other. (Id. at ¶¶ 13-14, 34; see Exhibit I to Plaintiff's Appendix, Doc. 161-9.) Plaintiff had originally been sitting next to a female student, but another student took Plaintiff's seat after a dinner stop and Plaintiff took an available seat next to a male student, who had no involvement in the sexual assault. (Id. at ¶¶ 11-12, 20.) The evidence, when construed favorably to Plaintiff, is insufficient for a juror to conclude that the seating rule's non-enforcement was a proximate cause of the assault, as Plaintiff was not assaulted by her male seatmate. As a result, the seating rule is not relevant to the Court's analysis.

and half days after the assault, Plaintiff requested and received approval for homebound instruction for the remainder of her freshman year. (Id. at ¶ 50.)

II.     **The Harassment**

Prior to Plaintiff's sophomore year, Plaintiff, her mother, and the District developed a plan to transition Plaintiff back into the school building. (Id. at ¶ 57.) The plan included accommodations to limit Plaintiff's contact with the student Defendants; for example, Plaintiff would not have classes scheduled with these students, would receive preference for lunch period seating, would receive an unrestricted hall pass, would have unlimited access to the guidance and nurse's offices, and would be allowed to request homebound status at any time, during which time the District would provide a teacher for in-home instruction and assignments. (Id. at ¶ 58-60.)

Despite this plan, Plaintiff had three encounters with Saado before graduating.[4] During their sophomore year, Saado came to speak with other girls at Plaintiff's lunch table in violation of the terms of Saado's probation. (Id. at ¶ 62.) Defendant Luca Passarelli ("Passarelli"), the Senior High School Principal, investigated the lunch table incident, confirmed that Saado did not speak to Plaintiff, and instructed Saado not to approach Plaintiff's lunch table again. (Id. at ¶¶ 77-80.)

Plaintiff had a second contact with Saado at the beginning of her junior year, when she saw Saado, a member of the tennis team, while attending a tennis match to take photographs for the yearbook. (Id. at ¶¶ 82-85.) Saado did not speak to Plaintiff or approach her, but directed threatening gestures toward Plaintiff; Plaintiff had been told by a friend that Saado might harm

---

[4] Plaintiff returned to the District for her sophomore year and completed that year. (Id. at ¶ 62.) Staph and Saado returned as well, but Plaintiff had no contact with Staph. (Id. at ¶ 63, 65.)

her physically if she were to attend. (Id. at ¶ 86.) After Plaintiff reported the incident, Passarelli spoke to Saado, but Saado was not disciplined for these actions. (Id. at ¶ 87.)

Plaintiff's third and final contact with Saado occurred when Saado entered a public restroom at the District, and went directly to a stall, while Plaintiff was washing her hands. (Id. at ¶ 88.) Passarelli again investigated this incident but took no action. (Id. at ¶ 90.)

Other than these contacts, there were times when Plaintiff became aware, through her friends, that Saado was spreading rumors about her at school, including that Plaintiff had lied about the assault, was pregnant, and had sexually transmitted diseases. (Id. at ¶¶ 94, 99; Exhibit B to Plaintiff's Facts 23, 55, Doc. 161-2.) In August 2014, while Plaintiff remained at the high school, Plaintiff's mother notified the District that Plaintiff's friend had told Plaintiff that Saado would "lay [Plaintiff] out" if Saado saw her. (Id. at ¶ 95.) Plaintiff's mother also notified the District about the rumor that Plaintiff had lied about the assault in September 2014. (Id. at ¶ 99.) Passarelli investigated these incidents by interviewing students, but the interviews failed to corroborate that Saado had spread rumors or made threats. (Id. at ¶¶ 96-102.)

Plaintiff left school for homebound instruction on October 8, 2014, near the beginning of her junior year, and she became aware later that month, also through a friend, that Saado had asked Plaintiff's friend whether Plaintiff was pregnant. (Id. at ¶¶ 104-105.) Plaintiff's mother informed the school of this conduct, which was investigated and confirmed by Passarelli. (Id. at ¶¶ 106-108.) Again, Passarelli took no further disciplinary action. (Id. at ¶¶ 109, 124.) Plaintiff completed high school through homebound instruction, college courses, independent study, and one class at the high school, graduating in 2016. (Id. at ¶¶ 110-113.)

**ANALYSIS**

Plaintiff's Amended Complaint (Doc. 141) states a 42 U.S.C. § 1983 claim against the Individual Neshannock Defendants for violating Plaintiff's Fourteenth Amendment right to personal security and bodily integrity by virtue of a state-created danger; a claim against the District for violating Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), by enabling Plaintiff's assault and sexual harassment through deliberate indifference; and a second 42 U.S.C. § 1983 claim against the District for failing to train and supervise the chaperones, resulting in the above constitutional violation.[5] (See generally Amended Complaint.) Several student and parent Defendants—Anthony Staph and his parents, Anthony and Shellie Staph; Tiara Saado and her parent, Elena Colia; and George Root and his parents, George and Tina Root—have also asserted crossclaims against the Neshannock Defendants, which state generally that the Neshannock Defendants may be liable for all or part of the claims asserted against the students and parents.[6] (See Docs. 6, 74, 75, 112, 113.)

The Neshannock Defendants move for Summary Judgment on all claims asserted against them, including the crossclaims above. (Doc. 147.) As to the state-created danger claims against the Individual Neshannock Defendants, Defendants argue that Plaintiff has failed to produce

---

[5] Plaintiff reasserts Title IX claims against the Individual Neshannock Defendants, which the Court previously dismissed on May 31, 2016 (Doc. 64) because Plaintiff had conceded that Title IX does not create a cause of action against individual defendants. As Plaintiff presents no argument for why these claims should be permitted against individual defendants, (see generally, Plaintiff's Brief), the Court will again dismiss these claims. The Court notes "the absence of any clear authority suggesting that [a] plaintiff can maintain a Title IX cause of action against an individual." Nelson v. Temple Univ., 920 F. Supp. 633, 638 (E.D. Pa. 1996).
In addition to the above-listed claims, the Amended Complaint also asserts state law claims against the student Defendants and their parents. For purposes of the instant SJM, these additional claims are relevant only to the crossclaims against the Neshannock Defendants.
[6] The student and parent Defendants also assert versions of this crossclaim against each other; these additional crossclaims are not pertinent to the Neshannock Defendants' SJM.

evidence that would allow a jury to find all the necessary elements for liability, and that the Individual Neshannock Defendants have qualified immunity for these claims. (Neshannock Defendants' Brief in Support of SJM 6-9, 23-24, hereinafter "SJM Brief," Doc. 151.) As to the Title IX claim against the District, Defendants argue that the assault was an isolated event, that the District responded reasonably to the assault and to Plaintiff's subsequent complaints of harassment, that the incidental contact with Saado and the rumors do not constitute harassment, and that Plaintiff's experience of harassment was not sufficiently severe as to deny Plaintiff equal access to education. (Id. at 15-22.) Finally, as to the failure to train and supervise claim against the District, Defendants argue that there was no underlying constitutional violation, and that Plaintiff has not identified any District policy or custom that was the moving force behind the assault.[7] (Id. at 10-13.)

The Court will address these arguments in turn.

## I. State-Created Danger Claims Against the Individual Neshannock Defendants

For a plaintiff to prevail on a 42 U.S.C. § 1983 claim that defendants violated her Fourteenth Amendment right to bodily integrity by creating a danger (a "state-created danger" claim), the plaintiff must show that:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

---

[7] As to the crossclaims asserted by the student and parent Defendants against the Neshannock Defendants, the Neshannock Defendants argue that they cannot be liable to the student and parent Defendants for these claims for three reasons: (1) the Defendants do not assert any facts beyond Plaintiff's facts, so there is no factual basis in the record for this liability; (2) Plaintiff's tort claims against the student and parent Defendants—for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision—are not theories of liability that could apply to the Neshannock Defendants as joint tortfeasors; and (3) the Neshannock Defendants are immune from such claims. (SJM Brief 24-25.) None of the student or parent Defendants have responded to the Neshannock Defendants' Motion for Summary Judgment on these claims.

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions . . .; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Bright v. Westmoreland Cty., 443 F.3d 276, 281 (3d Cir. 2006) (internal citations and quotation marks omitted). The Neshannock Defendants argue that Plaintiff has failed to provide sufficient evidence for the first, second, and fourth elements of a state-created danger theory. (SJM Brief 6-9.)

The Court agrees with the Neshannock Defendants that Plaintiff's evidence is insufficient to demonstrate the second element of a state-created danger claim. From Plaintiff's evidence, there is no basis for a reasonable juror to conclude that the Neshannock Defendants' conduct—as opposed to the student Defendants' conduct—shocks the conscience. Because the lack of evidence as to the second element is sufficient to resolve the state-created danger claims, the Court need not address the remaining elements of the state-created danger claims, nor Defendants' entitlement to qualified immunity.

As the parties argue, Sanford v. Stiles, 456 F.3d 298 (3d Cir. 2006), provides the relevant test for the Individual Neshannock Defendants' required culpability. (SJM Brief 8; Plaintiff's Brief 7.) "[I]n cases where deliberation is possible and officials have time to make unhurried judgments, deliberate indifference is sufficient" to shock the conscience. Sanford, 456 F.3d at 309 (internal quotation marks omitted). The evidence is sufficient to show that the Individual Neshannock Defendants had ample time to plan the school trip and implement safety measures. (See Plaintiff's Facts ¶¶ 4, 5, 114.) Thus, Plaintiff's burden is to provide evidence that could show the chaperones' deliberate indifference.

Plaintiff argues that several facts in evidence show deliberate indifference: that the purpose of the chaperones' presence on the bus was to ensure student safety; that the chaperones sat together at the front of the bus throughout the trip, including while a sexual assault occurred in plain sight; and that the chaperones did not notice the sexual assault despite their obligation to monitor the students. (Plaintiff's Brief 7.) In a vacuum, these facts might be sufficient to show deliberate indifference. They would tend to show that the chaperones played no role at all in ensuring proper behavior on the bus. In other words, those facts could show that the bus ride was effectively unchaperoned, demonstrating deliberate indifference to the obvious risks, including the risk of sexual assault. Yet, these facts do not stand alone. It is undisputed that the Individual Neshannock Defendants walked up and down the aisle on the bus, providing an opportunity for them to observe and correct misconduct. (Plaintiff's Facts ¶¶ 14, 34.) Despite their periodic walks up and down the aisle, it is undisputed that the chaperones did not observe the sexual assault. (Id. at ¶¶ 23-28, 30.) The Court thus finds that, at worst, Plaintiff's evidence shows that the chaperones were negligent in their failure to conduct more frequent and careful monitoring. "[N]egligent behavior can never rise to the level of conscience shocking," Kaucher v. County of Bucks, 455 F.3d 418, 426 (3d Cir. 2006), because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process," County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). See also Schieber v. City of Philadelphia, 320 F.3d 409, 419 (3d Cir. 2003) ("negligence is not enough to shock the conscience under any circumstances").

Plaintiff also argues that several additional facts show the chaperones' deliberate indifference, but these additional facts relate to actions that took place after the assault. For example, Plaintiff submits that: the chaperones failed to notice that Plaintiff "was sobbing in the

middle of the aisle on the floor for 15-20 minutes" after the assault; and the chaperones, who were also teachers and administrators at the District, failed to take actions to protect Plaintiff in subsequent years. (Plaintiff's Brief 7-8.) These actions, troubling as they are, cannot bear on the chaperones' culpability for creating a danger, if any, that caused the assault; they are irrelevant for purposes of Plaintiff's state-created danger claim. Cf. Morrow v. Balaski, 719 F.3d 160, 178 (3d Cir. 2013) (defendants' relevant actions must "affirmatively create[] or enhance[] a danger" that causes the relevant harm to plaintiff for liability to attach).

As Plaintiff has provided insufficient evidence for a reasonable juror to conclude that the Individual Neshannock Defendants were deliberately indifferent to the risk of a sexual assault occurring on the bus, the Court will grant the Neshannock Defendants' Motion for Summary Judgment on Plaintiff's state-created danger claims.

**II.   Title IX Claim Against the District**

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). To establish a Title IX claim against a school district based on the district's response to student-on-student sexual harassment, a plaintiff must show that:

> (1) the School District received federal funds; (2) sexual harassment occurred; (3) the harassment occurred under "circumstances wherein the [School District] exercise[d] substantial control over both the harasser and the context in which the ... harassment occurred"; (4) the [School District] had "actual knowledge" of the harassment; (5) the [School District] was "deliberately indifferent" to the harassment; and (6) the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school."

Doe v. N. Allegheny Sch. Dist., 2011 WL 3667279, at *7 (W.D. Pa. Aug. 22, 2011) (quoting and citing Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 640, 645, 650 (1999)) (alterations in original).

Again, rather than address each element, the Court agrees with the Neshannock Defendants that Plaintiff has failed to provide sufficient evidence from which a reasonable juror could conclude that the District's actions demonstrated deliberate indifference to the harassment. The undisputed evidence and Plaintiff's evidence are insufficient to show that the District's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648.

> As to the meaning of "deliberate indifference" in this context, Davis instructs that
>
> [the Court's conclusion]—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. We thus disagree with respondents' contention that, if Title IX provides a cause of action for student-on-student harassment, "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." Likewise, the dissent erroneously imagines that victims of peer harassment now have a Title IX right to make particular remedial demands. In fact, as we have previously noted, courts should refrain from second guessing the disciplinary decisions made by school administrators.
>
> School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. The dissent consistently mischaracterizes this standard to require funding recipients to "remedy" peer harassment, and to "ensure that . . . students conform their conduct to" certain rules. Title IX imposes no such requirements. On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. This is not a mere "reasonableness" standard, as the dissent assumes. In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.

Davis, 526 U.S. at 648-49 (internal citations and cross-references omitted). In light of this discussion, it is clear that the "deliberate indifference standard sets a high bar," T.B. v. New

Kensington-Arnold Sch. Dist., 2016 WL 6879569, at *7 (W.D. Pa. Nov. 22, 2016), and that overcoming this bar on a motion for summary judgment requires evidence "that the official disregard[ed] a known or obvious consequence of his action or inaction," id. (quoting Bernard v. E. Stroudsburg Univ., 2014 WL 1454913, at *16 (M.D. Pa. Apr. 14, 2014)). See also Butler v. Mt. View Sch. Dist., 2013 U.S. Dist. LEXIS 120867, at *19 (M.D. Pa. Aug. 26, 2013) ("The school district may . . . only be liable in damages where their own deliberate indifference to this actual knowledge [of sexual harassment] effectively causes the discrimination.").

Plaintiff argues that the following evidence is sufficient to show deliberate indifference to harassment:

> Despite the multiple complaints to the District administration that [there were] rumors about plaintiff being pregnant, having STDs or lying about the sexual assault, Saado was not disciplined and her actions did not cease. Plaintiff's mother sent emails with concerns she had about Saado, some emails of which were not answered by the administration because they believed the "plan" in place was working. [(]Plaintiff's Appendix, **Exhibit H** at 108-116.[)] Despite stating that a student who violated the plan and contacted or approached plaintiff would "absolutely" be disciplined, Saado was brought in to Passarelli's office, verbally warned repeatedly to leave plaintiff alone and cease rumors, yet continued to do so. [(]Plaintiff's Appendix, **Exhibit** H at 98-99.[)]

(Plaintiff's Brief 15.)

These facts, together with the undisputed facts in evidence, cannot reasonably be taken to show the high level of indifference required to state a Title IX claim based on peer harassment. In addition to the facts just quoted above, the following facts are undisputed. As soon as the District became aware of the assault, the District investigated the incident and took disciplinary action against all of the students involved with the exception of Defendant Ross. (Plaintiff's Facts ¶¶ ¶¶ 43-45, 49.) Other than seeing Ross in class upon her return to school freshman year (for one and a half days), Plaintiff had no contact with Ross and no complaints concerning Ross. (Id. at ¶¶ 50, 70-71.) In the months following the assault, the school developed and implemented

a plan to limit Plaintiff's contact with the students involved. (Id. at ¶¶ 57-60.) Once in place, the plan succeeded in limiting Plaintiff's encounters with her assailants to all but three pre-graduation run-ins with Defendant Saado over as many years. (Id. at ¶¶ 62, 82-85, 88.) None of these events involved physical or verbal contact with Plaintiff, although the second event involved threatening gestures from a distance. (Id.) After each of the first two events, Defendant Passarelli, the high school principal, investigated and spoke to Saado about staying away from Plaintiff, but took no disciplinary action. (Id. at ¶¶ 77-80, 87, 109.) After the third event, Saado's presence in a school restroom at the same time as Plaintiff, the principal investigated but took no corrective action. (Id. at ¶ 90.) The principal also investigated sex-based rumors and physical threats, made through intermediaries, directed against Plaintiff. (Id. at ¶¶ 96-102.) The parties agree that these investigations were unable to corroborate these rumors and threats, with the exception of Saado's question concerning whether Plaintiff was pregnant. (Id. at ¶¶ 97, 102, 106-07.)

Drawing all reasonable inferences against the District, this evidence could be taken to show that the District failed to act when additional action, such as formally disciplining Saado, would have prevented Plaintiff's continued harassment at school. The Court infers for present purposes that the District's actions were flawed, that they failed to leave Plaintiff with a school environment that felt safe, that the school's failure to severely punish her assailants deeply distressed Plaintiff, that Plaintiff faced cruel rumors spread by her peers, and that this environment drove Plaintiff to take home-bound instruction. (See Plaintiff's Brief 13.)

Yet, Davis specifically instructs that this is not enough; school districts need not purge their schools "of actionable peer harassment or . . . engage in particular disciplinary action." 526 U.S. at 648. "[C]ourts should refrain from second guessing the disciplinary decisions made by

school administrators." Id. The undisputed record before the Court shows that the District developed and implemented a plan to limit personal contact that largely succeeded in limiting contact; that it investigated all reported incidents of contact; that the principal counseled the harasser against her actions following all but one of the reported incidents; and that the District failed to take disciplinary action under circumstances indicating no direct physical or verbal contact. Under the legal standard above, no reasonable juror could find that this course of action constituted the District's deliberate indifference to Plaintiff's harassment or her educational rights. To the extent the District's actions were flawed, the Court finds as a matter of law that they were not clearly unreasonable. Accordingly, the Court will grant the Neshannock Defendants' Motion for Summary Judgment as to the Title XI claim against the District.

### III. Monell Claim Against the District for Failure to Train and Supervise

For the District to be liable under 42 U.S.C. § 1983 for a failure to train and supervise under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) ("Monell liability"), there must be an underlying constitutional violation. Monell, 436 U.S. at 690-91. The relevant constitutional claim in this case is the state-created danger claim discussed above. As the Court concluded, Plaintiff has not produced sufficient evidence to support this claim. Consequently, there can be no Monell liability against the District and the Court will grant the Neshannock Defendants' Motion for Summary Judgement on Plaintiff's Monell liability claim.

### IV. Crossclaims against the Neshannock Defendants

The student and parent Defendants assert crossclaims against the Neshannock Defendants that state, in substance, that the Neshannock Defendants may be liable for all or part of the tort claims asserted against them. (See Docs. 6, 74, 75, 112, 113.) The crossclaims do not assert any

additional facts, and the crossclaimants have not responded to the instant Motion for Summary Judgment.

All of Plaintiff's claims against the student and parent Defendants are Pennsylvania state law claims, (Amended Complaint ¶¶ 87-115), and the crossclaims against the Neshannock Defendants for contribution are, consequently, also state law claims. See A.C. v. Scranton Sch. Dist., 2017 U.S. Dist. LEXIS 46038, at *8 (M.D. Pa. Mar. 29. 2017) ("Federal Rule of Civil Procedure 13(g) pertains to a crossclaim against a co-party . . . . [This Rule] is procedural and does not itself create a right to indemnity or contribution." (internal quotation marks and citation omitted)). As the Court's jurisdiction in this case rests on the federal questions discussed above, and because the Court will grant the Neshannock Defendants' SJM as to all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, including the crossclaims against the Neshannock Defendants. 28 U.S.C. § 1367(c)(3); Lundgren v. AmeriStar Credit Solutions, Inc., 40 F. Supp. 3d 543, 551-52 (W.D. Pa. 2014).

\* \* \*

For the reasons stated above, the Neshannock Defendants' Motion for Summary Judgment (Doc. 147) is **GRANTED** in part as to Plaintiff's claims arising under federal law. The Court **DECLINES** to exercise supplemental jurisdiction over Plaintiff's remaining state law claims against the student and parent Defendants, and **DECLINES** to exercise supplemental jurisdiction over the Defendants' state law crossclaims. All remaining state law claims are **DISMISSED** without prejudice. The Court's Judgment Order will follow.

IT IS SO ORDERED.

July 26, 2018                                                  s\Cathy Bissoon

Cathy Bissoon
United States District Judge

cc (via ECF email notification):

All Counsel of Record